Amanda F. Esch (Wyo. Bar #6-4235)
DAVIS & CANNON, LLP
P.O. Box 43
Cheyenne, WY  82003
Telephone:  307/634-3210
*amanda@davisandcannon.com*

*Counsel for Plaintiffs*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JAN 31  PM 4: 14

STEPHAN HARRIS, CLERK
CHEYENNE

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| EIGHTEEN SEVENTY L.P., AND MARIE KENNEDY FOUNDATION,<br><br>       Plaintiffs,<br><br>  v.<br><br>RICHARD JAYSON,<br><br>       Defendant. | Civil Action No. 19CV 22-S |

## COMPLAINT

Plaintiffs Eighteen Seventy L.P. and the Marie Kennedy Foundation (collectively "Plaintiffs") allege as follows:

### The Parties

1.  Plaintiffs are United States persons.

2.  Plaintiff Eighteen Seventy L.P. ("Eighteen Seventy") is a limited partnership organized under the laws of Delaware, with its principal place of business in the District of Wyoming, in Big Horn, Wyoming.

3.  Eighteen Seventy is a private investment partnership owned by three brothers: Paul Kennedy, Peter M. Kennedy III, and John Kennedy.

1

4.     Eighteen Seventy's business is making decisions to invest in stocks, bonds, commodities, futures and other investment instruments, including private equity. Its business of investment decision-making is managed by two partners, Paul Kennedy and Peter M. Kennedy III, both of whom participated in the investment decisions described herein.

5.     Peter M. Kennedy III, currently resides, and during all relevant times resided, in Big Horn, Wyoming. John Kennedy also was a resident of Wyoming during the relevant times.

6.     Plaintiff Marie Kennedy Foundation (the "Foundation") is a private foundation formed under the laws of the State of Delaware, with its principal place of business in the District of Wyoming, in Big Horn, Wyoming.

7.     The Foundation makes grants to qualified grantees from a pool of capital, which is invested to generate funds for grants. Peter M. Kennedy III, President of the Foundation, makes the investment decisions for the Foundation in Wyoming, including the investment decisions described herein, with the participation of Paul Kennedy, Vice President of the Foundation.

8.     During the period of 2012 to 2016, Plaintiff Eighteen Seventy beneficially purchased shares of CRUPE Pte. Ltd. ("CRUPE" or "the Company"), a company organized and existing under the laws of Singapore and managed in Zurich, Switzerland, and debt of CRUPE's subsidiary, CRUPE Framing GmbH ("CRUPE Framing").

9.     During the period of 2013 to 2016, the Foundation also purchased shares of CRUPE and debt of CRUPE Framing.

10.     Defendant Richard Jayson ("Jayson" or the "Defendant") is a domiciliary and resident of the United Kingdom.

11.     Defendant was a founding principal of CRUPE, as one of CRUPE's four organizers who were accorded CRUPE common shares restricted to "founders" (in contrast to CRUPE preference shares, restricted to outside investors, such as Plaintiffs).

12.     Prior to joining CRUPE, Jayson was a sophisticated professional and certified public accountant, and had a long and close business relationship with Stuart Robertson ("Robertson"), another CRUPE founder who became CRUPE's CEO.

13.      Defendant served as a Director and Chief Financial Officer of CRUPE, and General Manager of CRUPE's China Operations from approximately 2011 until 2016.

14.     In his aforementioned roles, Defendant was aware of, had a hand in, and approved the offerings of securities to Plaintiffs.  In his various roles, Defendant also negotiated terms of certain investments in CRUPE securities made by Plaintiffs.

15.     Due to Defendant's conduct described herein, Plaintiffs only first discovered the matters complained of herein within the past four years.

16.     Defendant was also a director and officer of CRUPE Framing, which offered and issued debt securities to Plaintiffs.  Similar to his role in CRUPE, Defendant acted as Chief Financial Officer of CRUPE Framing from approximately 2012 to 2016, with similar responsibilities to his role as CFO of CRUPE.

17.     In the capacities described above, Defendant had duties of care and loyalty to (a) be informed about and record the true state of CRUPE's and CRUPE Framing's assets and liabilities, as well as its financial and operating condition and prospects, which would be relied upon by investors, such as Plaintiffs, in connection with their purchase of securities of CRUPE and of CRUPE Framing; (b) preserve and protect the value of investors' share and debt interests in CRUPE and CRUPE Framing; and (c) inform investors if he became aware that material facts were not being, or were falsely or erroneously being, provided to potential investors in connection with CRUPE and CRUPE Framing's offerings of securities.

18.     During his tenure at CRUPE and CRUPE Framing until 2015, Defendant was grossly negligent and breached his fiduciary duties to investors, such as Plaintiff, by primarily serving the interests of Stuart Robertson to the detriment of investors of CRUPE and CRUPE Framing.

<u>Jurisdiction</u>

19.     The Court has subject matter jurisdiction because this is an action between citizens of a State and a citizen or resident of a foreign state.  28 U.S.C. § 1332.

20.     The Court has personal jurisdiction over the Defendant because he transacted business within the United States and within the State of Wyoming and/or committed acts within the United States and within the State of Wyoming that caused harm to Plaintiffs in the State of Wyoming.

21.     As described herein, Defendant had a role in making continuous securities offerings in the United States and in the State of Wyoming, amounting to at least nine separate offerings of over $60,000,000, of which $13,000,000 were sold to investors in Wyoming and elsewhere in the United States.

22.     The foundational documents upon which the offerings and Plaintiffs' investments in CRUPE and CRUPE Framing were made were offering documents ("Offering Documents") consisting of an Investment Agreement, a Subscription Agreement, and an Information Memorandum setting forth material information about CRUPE's assets, liabilities, operations, financial condition, and prospects.

23.     The Offering Documents were delivered to Plaintiff Eighteen Seventy in Wyoming.

24.     The Offering Documents and other investment documents that were part of the offering of CRUPE and CRUPE Framing's securities to Plaintiffs unambiguously put Defendant on notice that he was dealing with a Wyoming entity:

      a.     The Investment Agreement, detailed more fully below, expressly sets forth that Eighteen Seventy's address is "P.O. Box 787, 98 Little Goose Canyon Road, Big Horn, Wyoming, USA 82833." The Investment Agreement was signed by Eighteen Seventy and by Defendant.

      b.     The Subscription Agreement that also was a part of the Offering Documents expressly sets forth Eighteen Seventy's address as "P.O. Box 787, 98 Little Goose Canyon Road, Big Horn, Wyoming, USA 82833."

      c.     Soon after the Offering Documents were delivered to Wyoming, Eighteen Seventy entered into a loan agreement with CRUPE, detailed more fully herein, in which the address of the lender Eighteen Seventy is set forth as "P.O. Box 787, 98 Little Goose Canyon Road, Big Horn, Wyoming, USA

82833." This loan agreement was signed by Eighteen Seventy and by Defendant. Defendant also participated in the negotiation of the loan agreement.

d.  A separate loan agreement between Eighteen Seventy as lender and CRUPE Framing as borrower, detailed more fully herein, sets forth the address of the lender Eighteen Seventy as "98 Little Goose Canyon Road, Big Horn, Wyoming, USA 82833." Further, in the "notices" section, the agreement requires notice to be given to the Borrower's CFO (Defendant), and to Eighteen Seventy at "98 Little Goose Canyon Road, Big Horn, Wyoming, USA 82833." This loan agreement was signed by Eighteen Seventy (per "Paul Kennedy, Partner") and by Defendant in three separate places. Defendant also participated in the negotiation of this loan agreement.

25.  In addition, it was common knowledge among CRUPE's and CRUPE Framing's management and directors, and known to Defendant, that Eighteen Seventy was a Wyoming-based entity, that Eighteen Seventy partner Peter M. Kennedy III was a resident of Wyoming, and that Paul Kennedy was likewise a partner of Eighteen Seventy.

26.  As a consequence, the hundreds of communications (email and phone calls and face-to-face meetings) between Defendant and partners of Eighteen Seventy were concluded with Defendant's full knowledge and appreciation that he was dealing with a Wyoming entity.

27.  As referenced above, Defendant was aware of, and authorized, the specific offerings of securities to Eighteen Seventy and the Foundation, upon which this Complaint is

based. He was also copied on many emails that made up the offer of securities to Plaintiffs, Wyoming entities. As a result of that involvement and his role as Director and CFO of CRUPE, Defendant was keenly aware that Plaintiffs were far and away the largest investors in CRUPE.

28.     Accordingly, Defendant purposely directed activity toward Wyoming through substantial and knowing contacts with Wyoming, the headquarters of CRUPE's largest investor, Eighteen Seventy and related entity the Marie Kennedy Foundation; and reasonably expected to be held to account in Wyoming for his role in causing damages to CRUPE's largest investor, a Wyoming entity, and to Marie Kennedy Foundation, also a Wyoming entity.

<u>Background</u>

29.     As detailed below, Jayson breached his fiduciary duties and was grossly negligent in performing his responsibilities, resulting in substantial injury to Plaintiffs.

30.     CRUPE was founded to market and to sell a unique building material throughout the world. The building material is created by combining a proprietary CRUPE additive with gypsum and cement that causes them to bind. The material can then be mixed with expanded polystyrene or perlite to create what was said to be an environmentally-friendly, seismically, thermally and acoustically superior building compound that is lighter than other building materials, with the added benefit of being fire-retardant.

31.     Prior to investing in CRUPE and CRUPE Framing, Plaintiffs were advised that the proprietary CRUPE additive was acquired from its inventors, was technology that was not able to be reverse engineered, and was being protected by patents pending in the United States and foreign countries. Plaintiffs were further advised that the technology, patent position, know-

7

how and registered trademarks constituted the intellectual property of CRUPE (owned through a subsidiary named CRUPE IP GmbH).

32.     The CRUPE technology is the most valuable part of CRUPE's intellectual property ("IP") and has been the most valuable, and nearly the exclusive, asset of the Company.

33.     In an Option Agreement signed by Defendant dated October 1, 2013, Defendant confirmed the IP's value at $100,000,000.

<u>Offering Documents</u>

34.     Beginning in around 2011, CRUPE sought funding to develop CRUPE's products based upon its IP and to market them.

35.     To raise capital for CRUPE, the Offering Documents were prepared with Defendant's input.

36.     As described above, the Offering Documents were provided to Eighteen Seventy in the District of Wyoming to induce it to invest in CRUPE securities, and both Plaintiffs relied on the Offering Documents in their decisions to invest in CRUPE securities and issue loans to CRUPE and CRUPE Framing.

37.     Defendant allowed the following erroneous material statements to be made in the Information Memorandum provided to Plaintiffs:

    a.     That the CRUPE additive material was "fully developed and commercialized," when in fact it was not;

    b.     That when mixed with synthetic gypsum, the product suffers "no

deterioration," when in fact there is significant deterioration from chloride in the mixed product;

c.    That net and gross margins are 300% and 600%, when in fact the margins were at least 90% less than the stated margins; and

d.    That there were only two "Key Risks"—product liability and competitors copying the technology—when in fact there were other serious and material undisclosed risks, of which the Defendant should have been well aware, including risks due to conflicts of interests, personal financial aggrandizement, waste of corporate assets, incompetent management, and the loss of control over and exclusive rights to the Company's IP.

38.    Defendant also stood by silently and was grossly negligent and breached his fiduciary duties in failing to ensure disclosure in the Information Memorandum of important facts to investors, including Plaintiffs.  These included:

a.    Failure to disclose that there were no reasonable or customary restraints on the authority of the CEO of CRUPE to remove funds from the Company;

b.    Failure to disclose the existence and terms of (i) the management contract given to East Pacific Group Ltd., CRUPE's CEO's own management company and alter ego, (ii) the management contract given to Northchase Ltd., Defendant's own management company, and (iii) other management contracts, including that those contracts committed CRUPE to pay $3,000,000 in sign-on bonuses, and that Eighteen Seventy's EUR 2.5

million investment was to be applied substantially to those bonuses, rather than to developing the business of CRUPE;

c.     Failure to disclose that the East Pacific Group Ltd. management contract was a device that was employed by Stuart Robertson, CRUPE's CEO, to violate Swiss laws requiring all Swiss income of Swiss residents (of which Robertson was one) to be reported, which to investors, such as Plaintiffs, was a fact material to (i) an assessment of the honesty of the management, and (ii) an evaluation of CRUPE's liabilities; and

d.     Failure to disclose that CRUPE's legal counsel (i) had serious conflicts as he was the private attorney for Stuart Robertson and his wife, and (ii) had received from Robertson, purportedly acting for CRUPE, an investment "gift" of approximately $1 million that was not disclosed to other investors and was to the detriment of other investors, such as Plaintiffs.

39.     The Company's control of the IP was the fundamental basis for an investment in the securities offered to Plaintiffs.

40.     As with many start-up companies with disruptive technology, the true value of CRUPE rested in its control of the IP, and CRUPE's control of the IP was a decisive factor in Plaintiffs' decision to invest.

41.     The Offering Documents set forth the following with respect to the company's IP:

a.     In the Information Memorandum, the statement that CRUPE, the Singapore parent company in which Plaintiffs invested, owned through

10

subsidiaries the patented technology on which the CRUPE business was based;

b.    In the Subscription Agreement, the statement that CRUPE was the indirect owner of 100% of the shares of the CRUPE subsidiary that owned the IP, and that the Company was taking all steps to protect its intellectual property;

c.    In the Investment Agreement, the statement that, "The Company [CRUPE] has been provided all the technology, patents and intellectual property rights associated therewith (the 'IP'), which it uses for its business on an irrevocably [sic] and exclusive basis by the inventors thereof.  It is the agreement with the inventors that all the IP will be held, registered, maintained and developed by the Company and its subsidiaries henceforth as owner of the IP;" and that the Company is taking all steps to protect the IP; and

d.    Further, in the Investment Agreement, the statement that the Defendant personally warranted that he would not take any action to transfer or license the IP outside the ordinary course of business or to dispose of any part of the business valued in excess of EUR 1 million.

42.    Defendant, however, stood silent and was grossly negligent and breached his fiduciary duties in failing to disclose to Plaintiffs that, as early as 2011 (prior to Plaintiffs' initial investments), Stuart Robertson planned to transfer out of CRUPE's control, for nothing, the shares of CRUPE IP, the CRUPE subsidiary which held the IP.

43.     Thereafter, Defendant remained silent and was likewise grossly negligent and breached his fiduciary duties in failing to disclose to Plaintiffs that the plan to transfer out of the Company's control the IP—with a value far in excess of EUR 1 million—had been devised and implemented, and that CRUPE and its beneficial owners were thus deprived of their most valuable asset. Nor did Defendant disclose to Plaintiffs that the commitments, including Defendant's personal commitments set forth in the Investment Agreement, had not been honored.

44.     On or about February 2, 2012, relying on the Offering Documents and as a result of Defendant's gross negligence in failing to fulfill his duties and inform Plaintiffs of critical information, Eighteen Seventy invested EUR 2.5 million (the equivalent of $3,313,000) in CRUPE A-1 Preference Shares.

45.     Also due to Defendant's gross negligence through silence and failure to fulfill his duties:

a.      Eighteen Seventy purchased additional CRUPE A-1 Preference Shares for $1,800,000 in July 2012, $500,000 in September 2013, $1,000,000 in May 2014, $300,000 in November 2014, and provided loans of $200,000 in May 2015 and $70,000 in April 2016;

b.      Eighteen Seventy invested another $2,000,000 by way of a loan facility to CRUPE in October 2012, and an additional $700,000 by way of a loan facility in October 2014; and

c.      The Foundation purchased CRUPE A-1 Preference Shares for $150,000 in

September 2013, and invested another $420,000 by way of a loan facility to CRUPE Framing in September 2013, and $35,000 in July 2016.

<u>Continuation of Gross Negligence and Breach of Fiduciary Duties</u>

46.     Stuart Robertson, oftentimes copying the Defendant, distributed to Plaintiffs statements that concealed the true state of affairs and induced them to invest more money by purchasing shares or loaning money to CRUPE and its subsidiaries.

47.     The statements boasted repeatedly of a large and growing order book, with the intention to lead investors, such as Plaintiffs, to conclude, and to lull them into believing, that sales and profits expectations were extremely positive, as sales and profits flow from committed orders.  Those statements included, at various times, for example, that the "order book" had 400 homes "signed" in Uruguay and steel frames for "500 homes confirmed;" that the "order book is in excess of US $600 million;" and that the "order book is $610 million."

48.     CRUPE's actual revenue over the 2012 to 2015 period, however, was only $3 million in the aggregate, mainly from sales of steel, rather than sales of the CRUPE additive.

49.     During that 2012 to 2015 timeframe, Defendant was the CFO responsible for financial matters, and for the preparation and/or verification of the Company's financial data, including the data contained in CRUPE's order books.

50.     As a result of Defendant's gross negligence and breach of his fiduciary duties, the order books used a definition of "orders" that was misleading and inappropriate, as it included orders with significant contingencies regarding performance, and disassociated expected cash to flow from orders.  Due to the Defendant's silence as to these deficiencies, Plaintiffs made

13

investment decisions based on materially false information in regard to their review of the order books.

51.     In addition, other financial data distributed to Plaintiffs throughout the relevant period confirmed that the IP was an asset, and under the control of CRUPE, when it was not. The Defendant was grossly negligent and breached his fiduciary duties in failing to correct such information before CRUPE distributed such information to Plaintiffs.

The CRUPE Framing Investment

52.     In or about June 2013, Robertson solicited Plaintiffs Eighteen Seventy and the Foundation to invest in secured loans to CRUPE Framing, said to be a special purpose subsidiary formed to hold title to machines called "rollformers." Rollformers are machines into which blank rolls of steel are fed, in order to be molded and cut to produce building frames. They are put out on contract to customers who pay a royalty on each meter of steel formed by the machines.

53.     Plaintiffs ultimately decided to make loans to CRUPE Framing pursuant to a loan agreement.

54.     To further induce Eighteen Seventy and the Foundation to provide CRUPE Framing with financing, Defendant caused to be prepared analyses indicating the number of rollformers in the field, the contracts for their use, and the royalties to be generated. Defendant was aware that these analyses would be distributed to Plaintiffs, and was grossly negligent and breached his fiduciary duties in failing to advise Plaintiffs that (a) the vehicle used was not a special purpose vehicle, but was one laden with debt; (b) the analyses included streams of payment from rollformers that were not under fixed contract and might be vulnerable due to

design flaws in the rollformers; and (c) the Company failed to implement provisions, negotiated by Defendant, that there be an escrow for the royalty payments and perfection of the Plaintiffs' security interest in CRUPE Framing's rollformers.

Transfer of Collateral for CRUPE Financing

55.     In 2012, Eighteen Seventy was induced to provide CRUPE with $2,000,000 in financing via a letter of credit facility.  Defendant was involved in the negotiations, and executed the agreement.

56.     The loan agreement required CRUPE to secure the loan with collateral consisting of the shares of CRUPE's subsidiaries.  Among the subsidiaries was CRUPE IP, which held the IP.

57.     In September 2014, also based on negotiations in which the Defendant was involved, Eighteen Seventy was induced to provide CRUPE with another $700,000 under a related letter of credit facility and to invest another $300,000 in CRUPE shares.  Defendant executed the Transfer Agreement that transferred the shares of CRUPE IP out of CRUPE's control for no consideration.  As a direct consequence of that transfer, an indispensable covenant in the loan agreement, which afforded Eighteen Seventy collateral that included the IP, was violated.

58.     Defendant remained silent and once again was grossly negligent and breached his fiduciary duties in failing to disclose to Eighteen Seventy the material fact that the loan agreement was violated by reason of the transfer of the collateral supporting it.

59.     As an express condition to providing the investments described in Paragraph 57 above, Eighteen Seventy required that there would be no further payments to management-controlled offshore companies, such as East Pacific Group and Northchase, until the Company became profitable.

60.     Defendant caused to be prepared and disseminated to Eighteen Seventy confirmatory spreadsheets that reflected $0 in the line entry for payments to the offshore management companies.  In reliance on the agreement and confirmatory spreadsheets, Eighteen Seventy agreed to restructure its previous letter of credit facility for $2,000,000, provide the additional $700,000, and invest an additional $300,000.

61.     Notwithstanding this agreement, almost immediately, Robertson, with the knowledge of Defendant, caused the Company to transfer $779,000 of Eighteen Seventy's financing to their offshore companies.

62.     Defendant remained silent and was grossly negligent and breached his fiduciary duties in failing to disclose to Plaintiffs the breach of the investment condition.

## FIRST CLAIM FOR RELIEF
### (Gross Negligence)

63.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 62 hereof as though fully set forth herein.

64.     Defendant, as a Director and CFO of CRUPE, and of CRUPE Framing, and General Manager of CRUPE's China Operations from approximately 2011 until 2016, owed Plaintiffs a duty to use the reasonable care and diligence as an ordinarily prudent person would exercise in a similar situation.

65.     By his actions and inactions, the Defendant was grossly negligent in demonstrating indifference to his legal duties, utter forgetfulness of legal obligations, and a heedless and palpable violation of legal duties respecting the rights of Plaintiffs. By those actions and inactions, Defendant exhibited a manifestly smaller amount of care than circumstances require of a person of ordinary prudence in his position.

66.     Defendant, as a Director and CFO of CRUPE and CRUPE Framing, and General Manager of CRUPE's China Operations from approximately 2011 until 2016, owed Plaintiffs duties to use reasonable care and diligence in the performance of his duties, including, but not limited to, the following: (a) being informed about and recording the true state of CRUPE's and CRUPE Framing's assets and liabilities, as well as its financial and operating condition and prospects, including CRUPE's revenue, sales, order books, assets and liabilities, and expected profits, which would be relied upon by investors such as Plaintiffs in connection with their purchase of securities of CRUPE and issuing loans to CRUPE Framing; (b) preserving and protecting the value of investors' share and debt interests in CRUPE and CRUPE Framing; and (c) informing investors if he became aware that material facts were not being provided, or being falsely provided, to potential investors in connection with CRUPE and CRUPE Framing's offerings of securities, including especially the status of CRUPE's IP, its most valuable asset; (d) ensuring that other information disseminated to Plaintiffs was not materially misleading and inappropriate, or omitted to state material facts; (e) ensuring that CRUPE disclosed accurate use of proceeds for which CRUPE asked Plaintiffs for funding; and/or (f) informing Plaintiffs of potential conflicts of interest and/or self-dealing by CRUPE's CEO and legal counsel.

67.     Defendant breached his duties, and was grossly negligent by his actions and inactions, including, but not limited to, the following: (a) allowing erroneous material statements

17

to be made in the Information Memorandum distributed to Plaintiffs; (b) failing to ensure that Plaintiffs were made aware of material information omitted from the Information Memorandum, such as the lack of constraints on the CEO, the existence of and terms and purpose of management contracts with East Pacific Group, Ltd. and Northchase Ltd., the Defendant's management company, and the potentially serious conflict of interest of CRUPE's legal counsel, and the preferential, sweetheart deal given to the legal counsel; (c) failing to disclose that Robertson intended to transfer CRUPE's IP, the Company's most valuable asset, out of CRUPE; (d) failing to disclose CRUPE's actual committed orders and revenue prospects, in contrast to the grossly exaggerated amounts Robertson bragged about in statements to Plaintiffs; (e) failing to disclose to Plaintiffs accurate information about its investment in CRUPE Framing; (f) failing to disclose that CRUPE had transferred its valuable IP, unbeknown to Plaintiffs; and/or (g) failing to disclose to Plaintiffs that, through Robertson's actions and/or inactions, the terms of both the Investment Agreement and an investment condition in a loan agreement with Plaintiffs had been violated.

68.     For each of the actions and/or inactions described above, Defendant acted without being reasonably informed, or was informed and failed to take necessary and proper action.

69.     For each of the actions and/or inactions described above, Defendant acted with gross negligence.

70.     As a direct and proximate cause of Defendant's gross negligence, Plaintiffs invested in CRUPE and its subsidiary, CRUPE Framing, and suffered damages of at least $10,488,000.

SECOND CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

71.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 70 hereof as though fully set forth herein.

72.     As a director and CFO of CRUPE and CRUPE Framing, Defendant served in a fiduciary capacity and owed duties of care and loyalty and to act as an ordinarily prudent person would to (a) inform himself of and record the true state of CRUPE's assets and liabilities, as well as its financial and operating condition and prospects, which would be relied upon by investors, such as Plaintiffs, in connection with their purchase of securities of CRUPE and of CRUPE Framing; (b) preserve and protect the value of investors' share and debt interests in CRUPE and CRUPE Framing; and (c) to notify investors, such as Plaintiffs, if he became aware that material facts were not being provided to potential investors, or that material facts provided to potential investors were erroneous,  in connection with the offerings of securities of CRUPE and CRUPE Framing.

73.     By his actions and inactions, Defendant grossly failed to perform and/or neglected his fiduciary duties, constituting a breach of his fiduciary duties.

74.     Defendant's actions and inactions in breaching his fiduciary duties included, but are not limited to:  (a) allowing erroneous material statements to be made in the Information Memorandum and distributed to Plaintiffs; (b) failing to ensure that Plaintiffs were made aware of material information missing from the Information Memorandum; (c) failing to disclose CRUPE's actual revenue prospects  to Plaintiffs; (d) failing to disclose to Plaintiffs accurate information about its investment in CRUPE Framing; (e) failing to disclose that CRUPE had

transferred its valuable IP, and (f) failing to disclose that Robertson violated the terms of an investment condition in a loan agreement with Plaintiffs.

75.     As a direct and proximate cause of Defendant's actions and inactions, Plaintiffs suffered damages of at least $10,488,000.

WHEREFORE, the Plaintiffs request the following:

a.     Compensatory, consequential and general damages in an amount to be determined at trial, but in no event less than $10,488,000;

b.     Costs and disbursements incurred in the prosecution of this action;

c.     Pre-judgment and post-judgment interest on any award;

d.     Reasonable attorneys' fees; and

e.     Such other and further relief as is just and proper.

<u>JURY TRIAL DEMAND</u>

Plaintiff demands a jury trial on all issues so triable.

Dated:  January 31, 2019

DAVIS & CANNON, LLP

Amanda F. Esch (Wyo. Bar #6-4235)
P.O. Box 43
Cheyenne, WY  82003
Telephone:  307/634-3210
*amanda@davisandcannon.com*

*Counsel for Plaintiffs*